**Blake JACKSON, a minor, by next friend and natural guardian, Joy M. JACKSON, and Joy M. Jackson**

v.

**NISSAN MOTOR CORPORATION IN U.S.A., and Nissan Motor Company, Ltd.**

No. 3–86–0543.

United States District Court, M.D. Tennessee, Nashville Division.

June 28, 1988.

Jeffrey L. Hall, P.C., Jacksboro, Tenn., Darrell Thomas Johnson, Jr., Hardeeville, S.C., and Cornelius J. Riley, for plaintiffs.

Jon D. Ross and Hunter C. Quick, Neal & Harwell, Nashville, Tenn., for Nissan Motor Corp. in U.S.A.

## MEMORANDUM

WISEMAN, Chief Judge.

This case comes before the Court on the defendants' motion for sanctions under Federal Rule of Civil Procedure 37. After two evidentiary hearings and careful consideration of the pleadings, depositions, and affidavits before the Court, defendants' motion is granted and the plaintiffs' claims are dismissed.

### I. *Facts*

On June 21, 1985, Robert Lee Jackson and his family were traveling on Interstate 40 when their 1978 Datsun was struck from the rear by Oscar L. Cook. The Jacksons filed two negligence actions against Cook, which were consolidated and settled before trial.[1] Plaintiffs were represented by Jeffrey L. Hall, an attorney from Jacksboro, Tennessee, and by Robert Warren, who was at that time a partner in the firm of Warren & Mallonee in Beach Mountain, North Carolina.[2]

On June 20, 1986, Ms. Jackson filed in this Court a products liability suit on behalf of her injured son Blake against the car manufacturers Nissan Motor Corporation in U.S.A. (NMC) and Nissan Motor Company, Limited (NML).[3] The complaint alleges negligence, strict liability for defective design, failure to warn, and breach of express and implied warranties. Again, the Jacksons retained the North Carolina firm of Warren & Mallonee and the Tennessee at-

---

1. *Jackson v. Cook,* No. 6039 (Tenn.Cir.Ct.1985); *Jackson v. Cook,* No. 3–85–1172 (M.D.Tenn. 1985).

2. Transcript of Evidentiary Hearing on Sanctions for April 21–22, 1988 [hereinafter "April 1988 Transcript"] at 9–10. Deposition of Robert W. Warren at 15–16.

3. *Jackson v. Nissan Motor Corp. in U.S.A.,* No. 3–86–0543 (M.D.Tenn. filed June 20, 1986).

torney Jeffrey Hall to handle the lawsuit.[4] Around March of that year, Warren asked a South Carolina attorney, Darryl Thomas Johnson, to investigate the products liability aspects of the case. Johnson did so, but did not enter an appearance in the lawsuit until much later.[5] Defendants are represented in the products case by Jon D. Ross and Hunter C. Quick, from the Nashville firm of Neal & Harwell.

Long before the products suit was filed, plaintiffs' attorneys in North Carolina decided to locate and purchase the wrecked 1978 Datsun. Warren instructed the firm's investigator, James Carl Nave, to locate the vehicle.[6] Aided in part by an accident report that Warren had given him, Nave tracked the Datsun to N & S Used Foreign Car Parts, a Nashville business run by Neil Chaffin.[7] To confirm the location, Nave wrote a February 7, 1986 letter in which he asked Wayne Lee, Jeffrey Hall's investigator in Tennessee, to visit the site.[8] On February 12, 1986, Wayne Lee went to N & S and spoke to Chaffin about the Datsun. Lee prepared a two-page memorandum about his visit.[9] He kept one copy in his files in attorney Hall's Tennessee office and sent another copy to Warren in North Carolina.[10] Lee's Memo to File, dated February 12, contains the name, address, and telephone number for N & S.[11] In the memo, Lee described the vehicle and said that he had paid a small deposit to hold the car until the North Carolina firm could pay Chaffin for it.[12] Lee probably spoke to Hall about the visit, as was his custom.

After Lee's visit, the plaintiffs' attorneys did in fact purchase the car from Chaffin. Warren & Mallonee paid $200 for the car by check on February 28.[13] The letter that accompanied the check explained the firm's intent to remove the car from the lot "as soon as possible" and confirmed the attorneys' understanding that no storage charges would accrue for ten days from that date.[14] Warren's March 10 letter to Chaffin shows that the firm revised its plans, promising to pick up the car within 45 days and to pay Chaffin a storage fee of $2.00 per day.[15] Although Chaffin apparently inferred from his initial conversation with Lee that the car was important to an attorney connected with Lee, none of the letters sent to Chaffin in spring of 1986 by Warren and Mallonee indicate that the car was a critical piece of evidence in a lawsuit and had to be carefully preserved.

The Jacksons' lawsuit was filed in June, and a series of exchanges followed between plaintiff's Tennessee attorney Jeffrey Hall and defendant's attorney Hunter Quick. Their subsequent letters and telephone conversations focused on defendants' request to inspect the Datsun and on plaintiffs' answers to two sets of defendants' interrogatories. Hall and Quick vehemently disagreed in their affidavits and at

---

4. April 1988 Transcript at 9–10. Warren Deposition at 15–16. Affidavit of Robert W. Warren at ¶ 2.

5. April 1988 Transcript at 149–51. Johnson mistakenly says that Warren first asked him for assistance in March of 1985, three months before the accident had even occurred. Further testimony revealed that Johnson "shortly thereafter" hired an expert witness in the summer of 1986. Johnson first submitted an appearance before the Court in this case at the April 3, 1987 Show Cause Hearing. April 1988 Transcript at 158–159.

6. Warren Deposition at 17; Deposition of James Carl Nave, Jr. at 10.

7. Nave Deposition at 10–12; Warren Deposition at 17–20.

8. *See* Defendants' Exhibit 6. Nave had already spoken with Chaffin by phone before Lee's visit but did not trust Chaffin's conflicting reports because he believed Chaffin had described another car. Nave Deposition at 16–17.

9. Defendants' Exhibit 7.

10. Transcript of Evidentiary Hearing on Sanctions for February 18, 1988 [hereinafter "February 1988 Transcript"] at 27–28; Defendants' Exhibit 8.

11. Defendants' Exhibit 7.

12. *Id.;* Defendants' Exhibit 1.

13. Defendants' Exhibits 2–3; Warren Affidavit at ¶ 3.

14. Defendants' Exhibit 2.

15. Defendants' Exhibit 4.

the evidentiary hearings about the timing and content of some of these exchanges.

Both attorneys agree that the defendants' initial query about the car came during an August 28 telephone call from Quick to Hall.[16] Quick asked Hall whether the car was still in existence and if so, where it was and when the defendants could inspect it. At the time of this first conversation, files in Hall's office contained photocopies of the receipt for the car, Warren and Mallonee's letter to Chaffin, Nave's letter to Lee, and Lee's February 12 memo: all of these documents identified the location of the wrecked vehicle.[17] Further, Lee worked in Hall's office and could easily have told him where the car was.[18] Yet, according to Quick, Hall incorrectly told him the car was being stored in Wilson County near the scene of the accident and that Hall had no other details about the storage. Hall agreed that defendants would be allowed to inspect the car and told Quick he would get back to him within the week.[19] Hall adds to this his assertion that he proposed a simultaneous inspection of the vehicle by plaintiffs and defendants at that time.[20] Quick denies that Hall ever offered a simultaneous inspection.[21]

When Quick did not hear from Hall by September 2, he called back to ask about inspecting the car. Again, Hall said he did not know where the car was being stored and would call Quick back soon to tell him.[22] Hall remembered that during this call, Quick was eager to schedule an expert exam and that Hall had promised to tell Quick when the plaintiff's expert exam would occur.[23] On September 9, Quick sent a letter to Hall confirming the attorneys' agreement to let defendants examine the car. Quick reiterated that he had heard nothing from Hall about the identity of the garage or an acceptable time for the inspection. He asked Hall to advise him "in the near future." [24]

Hall called Quick on September 11, informing him that plaintiffs' expert would inspect the vehicle on October 3.[25] Hall believes that he repeated his invitation for a simultaneous inspection at this time.[26] By contrast, Quick recalls that the plaintiffs' attorneys wanted to examine the vehicle before the defendants' attorneys could see it and also wanted a plaintiffs' representative to be present when defendants' expert examined the car.[27] At no time, according to Quick, did Hall suggest a simultaneous inspection.[28] Again, Hall gave Quick no details about the location of the vehicle.[29]

On September 18, defendant NMC submitted interrogatories to plaintiffs' counsel Hall. The interrogatories included a question on the whereabouts of the vehicle.[30] In the transmittal letter accompanying

---

**16.** Affidavit of Hunter C. Quick at ¶ 2; Affidavit of Jeffrey L. Hall at ¶ 4; April 1988 Transcript at 13–16; 89–90.

**17.** April 1988 Transcript at 71–76; Defendants' Exhibits 1, 2, 6, 7.

**18.** April 1988 Transcript at 73–74.

**19.** Quick Affidavit at ¶ 2; April 1988 Transcript at 90–91; Defendants' Exhibit 21.

**20.** Hall Affidavit at ¶ 4.

**21.** April 1988 Transcript at 96.

**22.** Quick Affidavit at ¶ 4; April 1988 Transcript at 94.

**23.** Hall Affidavit at ¶ 5; April 1988 Transcript at 20–23.

**24.** Defendants' Exhibit 14.

**25.** Hall Affidavit at ¶ 5; Quick Affidavit at ¶ 6; Defendants' Exhibit 24; April 1988 Transcript at 95–96, 104–105.

**26.** Hall Affidavit at ¶ 5; April 1988 Transcript at 33–36.

**27.** Quick Affidavit at ¶ 6; April 1988 Transcript at 95–96.

**28.** April 1988 Transcript at 96.

**29.** At the April evidentiary hearing, defendants' attorneys elicited from Hall that he had two occasions to ask Warren where the car was located. Immediately after his September 2 call with Quick, Hall telephoned Warren but did not ask Warren about the car's location. Hall also did not raise the issue in a six and one-half hour meeting with Warren on September 10. *See* April 1988 Transcript at 26–28.

**30.** *See* Defendants' Exhibit 16, Interrogatory 4; April 1988 Transcript at 38–40.

these interrogatories, Quick told Hall that he was "still talking" to his client about inspection of the car and would be back in touch as soon as a date could be set after plaintiffs' October 3 inspection.[31] Quick explained his letter at the April 21, 1988 evidentiary hearing by saying the arrangements for scheduling defendants' inspection were contingent on learning the location of the vehicle. In retrospect, Quick emphasized that he had envisioned no difficulties about inspecting the car, felt assured of the car's safety, and believed the attorneys "had an agreement" that plaintiffs would make the car available to defendants.[32] According to Quick, defendants were waiting about hiring experts until they learned when and where to send them. In contrast, Hall interpreted the September 18 letter to mean that Quick would set up the defendants' inspection and that Hall need do no more concerning the inspection until Quick contacted him.[33]

In his deposition and affidavit, Hall recalled that at some unspecified time between September 18 and October 3, Quick tentatively scheduled an inspection by defendants' experts on October 17 and later cancelled the inspection.[34] Hall based his recollection on an entry in the diary of Wayne Lee, his investigator. Quick absolutely denies that the defendants ever scheduled an expert deposition before the latter part of December, when their expert was first hired.[35] Plaintiff produced no additional correspondence to confirm this date nor do the phone records between the law firms show that any additional calls were made between September 18 and October 3.[36] When questioned further at the April 21 evidentiary hearing about his assertion, Hall first said he had been mistaken and that the date had been set during the September 11 phone call; later, Hall admitted that he did not believe Quick had ever set up the examination or called to cancel it.[37] Accordingly, the Court will attach no credibility to that assertion.

During the hiatus in which defendants were looking for an expert and awaiting answers to their interrogatories, plaintiffs inspected the Datsun on October 3. The plaintiffs' expert on defective design, Melvin Richardson, was accompanied by Darryl Thomas Johnson, the South Carolina attorney called in on the case by Hall, and by Wayne Lee, Hall's investigator.[38] Upon their arrival and request to see the vehicle, Chaffin jokingly told them the car had been crushed, then relented, saying he knew the car was important but that he had never been paid the storage fees which had been accruing since the car's purchase in February.[39] Chaffin told Lee "we have not disposed of the car, but I wanted you to know if something isn't done about the car being removed, we're going to dispose of this car."[40] The expert Richardson spent about two hours taking photographs of the car and dictating notes about his findings.[41] Afterward, Richardson and Johnson agreed that further testing would be required to determine whether the spattering and rust that disfigured the car were caused by battery acid.[42] Richardson knew that these tests would require partial dismantlement

---

31. Defendants' Exhibit 16.

32. April 1988 Transcript at 116–121.

33. Hall Affidavit at ¶ 6.

34. April 1988 Transcript at 40–41, 50–56; Defendants' Exhibit 11.

35. April 1988 Transcript at 96–98.

36. *Id.* at 86–88, 98–100; Defendants' Exhibits 21–24. In fact defendants' brief on sanctions asserts that no calls were made between Quick and Hall from September 11 through December 22. *See* Supplemental Memorandum of Law in Support of Motion for Sanctions at 6–7.

37. April 1988 Transcript at 50–56.

38. Defendants' Exhibit 10; February 1988 Transcript at 40.

39. February 1988 Transcript at 9–11, 40; April 1988 Transcript at 152–153; Johnson Affidavit. Lee, Chaffin, and Johnson all remembered Chaffin's comment.

40. February 1988 Transcript at 10.

41. Deposition of Melvin Kindrick Richardson, March 15, 1988 at 62, 123–125, Exhibit 2; February 1988 Transcript at 11.

42. Richardson Deposition at 76–78, 91–96; Johnson Affidavit; April 1988 Transcript at 155.

of the car and suggested that the tests be postponed until the defendant had a chance to inspect the car.[43] Johnson agreed, and the two men waited in the car for Lee to finish his dealings with Chaffin. In his affidavit, Johnson said that upon his return Lee had told them the storage fee had been paid to date;[44] however, at the February 18 evidentiary hearing, both Lee and Chaffin denied that any storage fees were paid at that time.[45] Chaffin added that plaintiffs' attorneys never paid any storage for the vehicle.[46] Neither an invoice nor a receipt for the storage fee was produced. Faced with these denials, Johnson later testified that he could not remember exactly what Lee had said when he returned to the car.[47] Lee left Warren & Mallonee's name with Chaffin. Upon Lee's return, he talked with Hall about his trip, as was his custom.[48] He then memorialized the inspection in a memo to the Jackson file dated October 3, which said that Chaffin "quickly calculated his storage fee and stated that it would be about $800.00 to date and that he expected payment soon."[49] The memo also contained Neil Chaffin's name and business address.

On October 7, a few days after plaintiffs' inspection, Robert Warren, the North Carolina attorney who had made initial purchase arrangements for the car, withdrew from the case.[50] This meant that the Tennessee attorney Jeffrey Hall was then the only attorney of record for the plaintiffs.

Warren notified Hall in Tennessee that the firm needed reimbursement for the car.[51] Warren's records, like Hall's, contained ample references to Neil Chaffin's business. Yet, his conversation with Warren prompted Hall neither to pay the outstanding storage fees nor to tell defendants the precise location of the car.[52]

Throughout the days that followed, Chaffin waited to receive storage fees for the Datsun. By October 28, he had received no further instructions from Warren & Mallonee, which was no longer involved in the litigation, no further instructions from Hall or Lee, and most important, none of the storage fees which had been accruing since the plaintiff's purchase of the car in February.[53] On the afternoon of October 28, Chaffin called the number that Lee had left with him, the number of Warren & Mallonee's office. No one in the office took the call, but Chaffin left a message with the answering service.[54] He said that the attorneys needed to get back in touch with him if they did not want the car destroyed. When he received no answer to his message the following day, Chaffin sold the car to West Nashville Auto Salvage, which scrapped the car.[55] According to Chaffin, Lee had never told him that anyone else would ever examine the vehicle.[56] Warren denies ever receiving Chaffin's message.[57] Yet, after the October 3 inspection none of the plaintiffs' attorneys ever contacted Neil

43. Richardson Deposition at 91.

44. Johnson Affidavit.

45. February 1988 Transcript at 14–17, 42–45.

46. February 1988 Transcript at 16.

47. April 1988 Transcript at 153–154.

48. February 1988 Transcript at 46; April 1988 Transcript at 57–58. Chaffin said that after he emphasized the need for storage fees on the vehicle, Lee promised to tell his firm about the overdue charges. February 1988 Transcript at 11. Lee wrote the memo indicating the amount of fees due. He admits he discussed his trip with Hall but denies that he emphasized the charges to Hall. February 1988 Transcript at 46–47.

49. Defendants' Exhibit 10.

50. Warren Affidavit at ¶ 3; Warren Deposition at 39–40.

51. Warren Affidavit at ¶ 3; April 1988 Transcript at 60–62.

52. *Id.* In fact, Hall said he did not recall talking with Warren about reimbursing Warren & Mallonee for the purchase price of the car.

53. February 1988 Transcript at 11–12.

54. *Id.* at 12–13.

55. *Id.* at 13–14. Chaffin said that the car was loaded onto a truck in his lot and remained there for three or four days before it was taken to West Nashville Auto Salvage.

56. *Id.* at 14.

57. Warren Affidavit at ¶ 8–13.

Chaffin again until late January of 1987. Plaintiffs' attorneys have never explained why they did not contact Chaffin, pay the storage fees, or have any inkling that the car had been destroyed until almost three months after the fact.

On November 18, defendants' attorney Ross sent Hall a set of interrogatories from defendant NML and a transmittal letter observing that the NMC interrogatory answers were approximately 30 days overdue.[58] Ross asked Hall to let him know promptly when the answers, which included the location of the Datsun, would be forthcoming. Defendants received no answer. After at least one unsuccessful attempt to reach Hall by phone, Quick called Hall on December 22 and insisted on immediate inspection of the vehicle and answers to the first set of interrogatories.[59] For the first time, Hall told Quick that the car was stored in Nashville, not Wilson County, although he would not name the precise location.[60] Quick said the defendants would soon have hired their expert and promised to call back the next day to fix a date. Defendants engaged Ken Sorenson from Invetech, Inc. in Houston, as an expert on December 23.[61] That same day Quick called Hall and scheduled defendants' first inspection for January 21. Quick emphasized that the defendants needed interrogatory answers to help their experts prepare for the inspection but granted plaintiffs until January 15 to answer, almost a three month extension from the original due date of October 19.[62]

When the interrogatories did not arrive on January 15, Quick tried unsuccessfully to call Hall.[63] On January 16, Quick learned that defendants' experts needed to reschedule the inspection, and again he tried to call Hall. Quick did not reach Hall until the 19th, and he believes Hall was refusing to return his messages.[64] During their conversation on the 19th, the parties rescheduled defendants' vehicle inspection for January 30 and agreed that Wayne Lee would take defendants to the site.[65] Quick, who was receiving considerable pressure from his superiors about the tardy interrogatories, in turn insisted that Hall submit the answers immediately. Hall promised to sent the answers to Quick by courier in two days.[66] When the promised answers did not arrive, Quick "fired off" an angry letter to Hall in which he said Hall's failure to answer had hampered the defendants' inspection and that continued silence would result in a motion to compel answers.[67] An unsigned draft copy of the answers was finally delivered to Quick by Wayne Lee on January 30 when Lee arrived to take Quick and the expert Sorenson to inspect the

---

58. Defendants' Exhibit 17; Quick Affidavit at ¶ 8.

59. Quick Affidavit at ¶ 9; April 1988 Transcript at 100–102.

60. *Id.*

61. *Id.* at 102; Defendants' Exhibit 25. John Slater, an Invetech corrosion expert, advised Sorenson about what to look for during his January 1987 inspection. Slater and Sorenson planned to perform a more detailed follow-up examination at a later date. Deposition of John Edward Slater at 6–9.

62. April 1988 Transcript at 102–103; Quick Affidavit at ¶ 10. Hall has testified that at a date as early as September 11, Quick granted Hall an "indefinite extension" on the NMC answers to interrogatories. *See* April 1988 Transcript at 49–51. Yet, according to Hall, this extension had been granted *before* the interrogatories had ever been served. No documentation for this early extension exists. In fact, the letters from Neil & Harwell to Hall about the interrogatories show that defendants' attorneys were concerned about Hall's failure to answer and that they waivered between courteous extensions of time and a more drastic motion to compel. Defendants' Exhibits 17, 27. Quick denies the indefinite extension outright. April 1988 Transcript at 97. With the exception of Hall's unsupported statement, no evidence of this indefinite extension exists. Accordingly, the Court attaches no credence to it.

63. *Id.* at 107.

64. *Id.* at 109.

65. *Id.;* Defendants' Exhibit 26; Quick Affidavit at ¶ 11.

66. April 1988 Transcript at 108; Quick Affidavit at ¶ 11.

67. April 1988 Transcript at 109–110; Defendants' Exhibit 27; Quick Affidavit at ¶ 12.

car.[68]

When Lee, Quick and Sorenson arrived at N & S Auto, Chaffin told them that the car had been scrapped in October.[69] The three men went immediately to West Nashville Auto Salvage in a vain attempt to recover the vehicle but soon realized that in fact the car had been crushed months before.[70]

Defendants moved for alternative sanctions under Fed.R.Civ.P. 37 and sought either dismissal of the lawsuit or preclusion of all the evidence about the car. On April 3, 1987, the Court held a Show Cause hearing for plaintiffs' failure to file a scheduling order. At that time, the Court stayed further proceedings pending full discovery of the sanctions issue. Numerous depositions and affidavits were taken and later filed with the Court. On February 18, 1988 the Court held its first evidentiary hearing on sanctions and heard testimony from Neil Chaffin, Wayne Lee, and Jeffrey Hall. At the conclusion of the hearing, the Court ordered that both parties' experts be deposed at plaintiffs' expense in an effort to see whether defendants' experts could rely on plaintiffs' expert findings obtained at the October 3, 1986 inspection. The Court held a second evidentiary hearing on April 21–22, 1988, during which Jeffrey Hall, Hunter Quick, and Darryl Thomas Johnson testified. Painstaking consideration of all the evidence before it leads the Court to conclude that the severe sanction of dismissal is appropriate in this case.

II. *Court's Power to Impose Sanctions*

■ Defendants' brief on sanctions states that district courts have inherent power under Fed.R.Civ.P. 37 to impose sanctions. *See* Memorandum of Law in Support of Defendants' Motion for Sanctions [hereinafter "Defendants' Memorandum"] at 15, *citing Roadway Express, Inc. v. Piper*, 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980). Defendants' Supplemental Brief underscores the inherent power of a court to maintain the integrity of judicial proceedings. Supplemental Brief at 12. In *Roadway Express*, the Supreme Court referred to a court's inherent power on the narrow issue of awarding attorneys' fees as a sanction. However, the Court has expressly stated that reliance on "inherent power" is an unnecessary addition to Rule 37 that only obscures analysis. *See Societe Internationale Pour Participations Idustrielles v. Rogers*, 357 U.S. 197, 207, 78 S.Ct. 1087, 1093, 2 L.Ed.2d 1255, 1264 (1958); 8 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 2282 at 757–59 (1970 & Supp.1987) (resort to authority outside the Federal Rules criticized by the Court as needless and confusing). The Supreme Court has also specifically said that there is no need to rely on Fed.R.Civ.P. 41 to determine whether dismissal is an appropriate sanction. *See Societe*, 357 U.S. at 207, 78 S.Ct. at 1093. Hence, the Court will rely solely on its authority under Fed.R.Civ.P. 37, which permits sanctions for failure to make or cooperate in discovery. Any failure, regardless of intent, violates the Rule. *See* Notes of Advisory Committee, citing *Societe*, 357 U.S. at 208, 78 S.Ct. at 1093. But intent is relevant in considering what sanction, if any, should be imposed. *Id.; Patterson v. Township of Grand Blanc*, 760 F.2d 686, 688 (6th Cir.1985).[71]

**68.** April 1988 Transcript at 110–111; Quick Affidavit at ¶ 13.

**69.** April 1988 Transcript at 112–114; Quick Affidavit at ¶ 13–14.

**70.** April 1988 Transcript at 112–114; Quick Affidavit at ¶ 15.

**71.** There are due process limits on a court's imposition of sanctions under Rule 37. In *Hammond Packing Co. v. Arkansas*, 212 U.S. 322, 29 S.Ct. 370, 53 L.Ed. 530 (1909), the Supreme Court affirmed a default against a defendant who failed to produce relevant books and papers, even after a court order to produce them. When the failure to comply creates a presumption of bad faith or untruthfulness in responses that are made by the nonproducing party, no due process violation occurs by imposing sanctions. The failure to produce is tantamount to saying that the case is without merit. *See Insurance Corp. of Ireland, Ltd. v. Compagnie Des Bauxites de Guinea*, 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982) (applying *Hammond Packing* presumption to enforce unusual sanction of assuming personal jurisdiction existed).

### III. *How Rule 37 Works*

Rule 37 and its seven subsections provide two basic frameworks for imposition of sanctions. Subsections (a) and (b) reveal the typical pattern, in which one party fails to cooperate and the opposing party moves to compel discovery. The motion, if granted, results in a court order to compel discovery. Failure of the recalcitrant party to cooperate is then contempt of a court order. Under 37(b), the court has a wide range of sanctions available, including the dismissal of the lawsuit.

The general language of 37(b) says that in selecting a sanction, the Court may make such orders in regard to the failure as are just. Fed.R.Civ.P. 37(b)(2). The Supreme Court has added an important gloss to this language for the sanction of dismissal, however. When the failure to cooperate is based on a party's inability to produce and not on the fault, bad faith, or willfulness of the nonproducing party, the extreme sanction of dismissal is too severe. *See Societe*, 357 U.S. at 212, 78 S.Ct. at 1095. *See also, Regional Refuse Systems Inc. v. Inland Reclamation Co.*, 842 F.2d 150, 153 (6th Cir.1988); *Patton v. Aerojet Ordnance Co.*, 765 F.2d 604, 607 (6th Cir. 1985). According to the Sixth Circuit, the burden of proof is on the noncomplying party to show that the failure was due to inability and not to willfulness, bad faith, or fault. *See Regional Refuse*, 842 F.2d at 154.

█ A finding of flagrant bad faith undoubtedly supports dismissal. *See National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (refusal to answer interrogatories despite time extensions, warnings, and court orders over a 17 month period); *Regional Refuse*, 842 F.2d at 154 (outrageous conduct by plaintiff at deposition). Pretense of good faith is also insufficient to prevent dismissal. In *Regional Refuse*, plaintiff's behavior during his deposition revealed that he consistently made a colorable effort to seem to be acting in good faith while in fact consistently refusing to supply relevant and unprivileged information. The Sixth Circuit observed that "misconduct is not any less misconduct because it is executed with a veneer of good intentions." *Id.* at 156. Other relevant factors for the Court to consider when imposing the sanction of dismissal include whether the adversary is prejudiced by the nonproducing party's failure to cooperate in discovery; whether the nonproducing party has been warned that failure to cooperate may lead to dismissal; and whether less drastic sanctions are imposed or considered before dismissal is ordered. *See id.* at 155. Generally, a Rule 37(b) dismissal is inappropriate absent a prior court order. *See* Wright & Miller, § 2289 at 790 and 1987 Supp. at 304 (citing fourteen cases as support). *But see, Davis v. Marathon Oil Co.*, 528 F.2d 395, 404 (6th Cir.1975) (imposition of a lesser Rule 37(b) sanction, exclusion of witnesses, permitted though no prior court order).

Rule 37(d) reveals a less typical scenario in which sanctions may be imposed although no prior court order has ever been issued. If a party fails to attend a deposition, answer interrogatories, or respond to a request for inspection, the court may make such orders as are just and may proceed as authorized under Rule 37(b)(2)(A),(B), and (C). Under Rule 37(d), the Court may also award fees and expenses caused by the failure unless the failure is justified or the award otherwise unfair. Just as in 37(b) cases, the failure need not be willful to invoke sanctions, but intent is an apt consideration in deciding what sanction to impose. *See* Wright & Miller, § 2291 at 812. The court's options include:

1. An order that designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order. 37(b)(2)(A).

2. An order refusing to allow the delinquent party to support or oppose designated claims or defenses. 37(b)(2)(B).

3. An order prohibiting the delinquent party from introducing designated matters in evidence. 37(b)(2)(B).

4. An order striking out pleadings or parts thereof. 37(b)(2)(C).

5. An order staying further proceedings until the party complies with the request for discovery. 37(b)(2)(C).

6. An order dismissing the action or proceeding or any part thereof. 37(b)(2)(C).

*Id.*

██ Contempt of a prior court order is not required for imposition of sanctions under Rule 37(d). *See Coon v. Froehlich,* 573 F.Supp. 918, 923 (S.D.Ohio 1983); Wright & Miller, § 2291 at 807. The rationale of these cases is that it is senseless to require a court order to secure compliance when an injured party may not know until after the fact that anything has been withheld. *See Badalamenti v. Dunhams, Inc.,* 118 F.R.D. 437, 439 (E.D.Mich.1987); *cf. Davis,* 528 F.2d at 404 (when defendant did not refuse to answer interrogatory but gave evasive response, plaintiff could not have known that a motion to compel would be appropriate).

Notes of the Advisory Committee on Rule 37(d) observe that, notwithstanding the harsh sanctions permitted by the Rule, courts generally have interpreted it as allowing for more lenient penalties. Courts in our circuit that have addressed the issue run true to this pattern, shying away from dismissal and favoring imposition of attorneys' fees instead. In one unusual case, however, a taxpayer sued a government agent for civil rights violations allegedly caused by the agent's illegal disclosures about her made during his investigation. *Granger v. Williams,* 112 F.R.D. 222 (D.Mich.1986). The taxpayer then refused to produce the records on which the claim was based. Because the failure to comply with the request for production thwarted the defendant's attempts to defend and was a wanton, flagrant violation of the court's rules, a 37(d) dismissal was deemed apt. *Id. Cf. Monogram Models Inc. v. Industro Motive Corp.,* 492 F.2d 1281, 1287 (6th Cir.1974) (a default on damages appropriate under 37(d) for failure to answer interrogatories). Hence, dismissal is a severe sanction and may in fact rarely be imposed; but the court's power to invoke this sanction in appropriate circumstances is undeniable.

The Sixth Circuit explicitly states that when the sanction of dismissal is imposed, the trial court must articulate on the record the factual and legal issues invoked.

> When the sanction of dismissal is imposed, 'values of consistency and predictability, reviewability, and deterrence ... outweigh the values of economy and efficiency that may be promoted by allowing inarticulate decisions.'
>
> . . . .
>
> We ... require under our supervisory authority that a dismissal of a complaint with prejudice as a sanction for failure to cooperate in discovery must be 'accompanied by some articulation on the record of the court's resolution of the factual, legal, and discretionary issues presented.'

*Patton v. Aerojet,* 765 F.2d at 608 (citations omitted). *See Regional Refuse,* 842 F.2d 154 (encouraging an extensive and painstaking examination of the basis for dismissal); *Bishop v. Cross,* 790 F.2d 38 (6th Cir.1986). In this memorandum the Court has set forth in detail its factual findings as well as the legal standards to be applied in Rule 37(d) dismissals. Now, the Court will explain why dismissal is appropriate on these facts.

### IV. *Analysis*

██ Although the parties refer to Rule 37(b) in their briefs, this case falls squarely within the strictures of Rule 37(d). The plaintiff failed to respond to a request for inspection. That a court order was not sought is not an issue for purposes of rendering sanctions under Rule 37(d). The elements of Rule 37(b) which have been incorporated into Rule 37(d) and are outlined above comprise the Court's options. Given the Supreme Court's admonition in *Societe Internationale,* the case cannot be dismissed absent a finding that the plaintiffs' attorneys exhibited fault, bad faith, or willfulness. Despite evidence in the record to the contrary, the Court does not find that these attorneys showed bad faith

or willfulness. Their misconduct arises not from a calculated plot to deprive defendant of relevant evidence but from extremely careless inaction. The Court finds plaintiffs' attorney at fault in their handling of important aspects of discovery in this case. Lesser sanctions—precluding all evidence of the car or permitting defendants' experts to share the results of plaintiffs' October 3 inspection—have been explored and are not feasible on these facts. Because plaintiffs' attorneys were grossly negligent in their care of the car and because their conduct has made other sanctions untenable, the case is dismissed.

Although plaintiffs hired three different attorneys to handle various stages of the products case, Jeffrey Hall had the primary responsibility for the lawsuit. Indications of Hall's negligence may be seen in his repeated refusals to answer the NMC interrogatories in a timely way. After a series of broken promises, defendants received draft unsigned answers on the very morning of defendants' scheduled inspection, although Quick had emphasized that the answers were needed to prepare for the inspection. By the time the answers were received, they were too late to be helpful.

Most important are the events surrounding destruction of the 1978 Datsun. Hall was at fault because he failed to tell defendants' attorneys the location of the car and because he failed to take simple, reasonable steps to secure the most important piece of evidence in the case.

The evidence plainly shows that Hall had readily available information about the location of the car from at least February of 1986. Repeatedly, Hall did not respond to Quick's inquiries by telephone, by letter, or by interrogatory answers. Hall cannot claim an inability to respond to Quick's request when this information was at his fingertips. Apparently, Hall shrugged off the request given the press of other cases and, perhaps, an underlying belief that answering promptly was just not that important. Hall's unwillingness to make the minimal effort necessary to tell Quick that the car was stored at Chaffin's lot contravenes the cooperative spirit of discovery.

These laggard omissions would themselves be sanctionable—but far more serious is that Hall's continued inaction contributed to the destruction of the car.

Plaintiffs' attorney not only failed to share the information he had about the car, but he also failed to ensure its safety. The initial letters to Chaffin from Warren & Mallonee and discussions between Chaffin and Wayne Lee, Hall's investigator, told Chaffin that a law firm was purchasing the car but not that it was a critical piece of evidence that required safekeeping. From February 28 when the car was purchased until October 3 when plaintiffs' expert inspected it, plaintiffs' attorneys did not pay a single dollar of the accruing rental fee. Even after the October inspection, when Chaffin explicitly told Wayne Lee that plaintiffs' attorneys must pay the fee or relinquish the car, Hall did nothing.

Plaintiffs' attorneys argue that no payments were made because a single rental payment was anticipated at the end of the bailment. But the evidence of the transactions with Chaffin refutes this. Chaffin normally does not lease space for car storage. He agreed to let the plaintiffs store the car on the lot for a nominal fee both as a favor and because he believed that the bailment would be short-term. The letters from Warren & Mallonee to Chaffin indicate that the storage period would be brief. Chaffin's "joke" on October 3 about crushing the car and his insistence that the fee be quickly paid also belie plaintiffs' assertions that one payment was to be made when all parties were through with the car. Finally, Chaffin tried to notify plaintiffs' attorneys before disposing of the car entirely. None of these facts correspond to the notion that plaintiff reasonably expected to pay a single installment at the end of the bailment.

Even assuming that Chaffin's action was precipitous, it was nonetheless extremely negligent in these circumstances for Hall neither to instruct Chaffin about preservation of the vehicle nor to inquire about a payment schedule for the bailment. With the single exception of plaintiffs' October 3 inspection, the silence of plaintiffs' attor-

neys on these crucial matters was unbroken for almost a year, from the purchase of the car in February of 1986 to the defendants' attempted inspection in January of 1987. The importance of the car and the warning Hall had received make this inaction sanctionable.

The Court sought to avoid dismissal by ordering additional expert discovery, designed to see whether in a products case the defendants' expert could make use of the October 3 examination by plaintiffs' expert. This step was another way of examining the prejudice the defendants had actually incurred by their complete inability to test the car themselves. Unfortunately, the experts' depositions reveal that this prejudice was severe and irremediable.

Plaintiffs' theory is that Blake Jackson was injured when the collision thrust the battery, located behind the left rear wheel, into the car and caused it to spray battery acid into the car's interior. Blake Jackson was thrown from the car during the collision. It is disputed whether his substantial injuries were caused by road burns or by battery acid burns. Hence, the presence or absence of battery acid in the car's interior is the sine qua non of causation in this case.

During the October 3 inspection, Melvin Kindrick Richardson, a former professor of mechanical engineering who now works as an expert witness in products cases, spent about two hours examining the car.[72] He made a series of photographs and took notes. Based on his visual inspection, Richardson is prepared to testify that the car was defectively designed because the battery was located close to the car occupants, and because there was little in the car to shield them from corrosive acid if the battery was forced up into the car during a collision.[73]

Despite the critical importance of the battery to this theory, the battery was not in the car when Richardson examined it.[74] Plaintiffs' expert relies on other facts to support his theory. The collision itself is one such fact, although Richardson's notes say the penetration of the battery into the car appeared minor.[75] There were plastic pieces of a battery or battery cover strewn throughout the interior, although Richardson's inspection could not reveal how or when the breakage occurred.[76] Excessive rust appeared at the place where the battery had been.[77] Stains also appeared on the back seat, on the exterior, on the right wheel cover, and on other metal parts of the car.[78] Richardson believed some of these rusted spots were worse than rust caused by exposure, but he admitted other causes could not be ruled out.[79]

Interestingly, Richardson foresaw the need for chemical tests to determine the precise cause of corrosion and discussed this possibility with plaintiffs' attorney Darryl Thomas Johnson at the October inspection.[80] Richardson would not have performed these tests himself but would have sent samples to a lab for chemical analysis. In his deposition, Richardson agreed that he would defer to a corrosion specialists' expertise on the presence or absence of battery acid in the car.[81] Richardson's opinion is confined to the allegedly defective design of the car, not to the cause of the plaintiffs' injuries or reconstruction of the collision.[82]

Defendants had hired two experts in preparation for the January 1987 inspection: John Edward Slater, a materials consultant who specializes in corrosion analysis, and Ken Sorenson, an accident recon-

**72.** Deposition of Melvin Kindrick Richardson at 62–65, 123–125.

**73.** *Id.* at 57–60.

**74.** *Id.* at 65.

**75.** *Id.* at 65–66.

**76.** *Id.* at 67.

**77.** *Id.* at 78–82.

**78.** *Id.* at 75, 88, 89, 96–97, 102–104, 109.

**79.** *Id.* at 79–82.

**80.** *Id.* at 76–78, 91–96.

**81.** *Id.* at 91–96, 126–143.

**82.** *Id.* at 54–56, 106, 125–126.

structionist. After a briefing by Slater, Sorenson visited N & S with defendants' attorney Quick in January. Slater was deposed on the causation issue. Slater examined Richardson's notes and photos and was present during Richardson's second lengthy deposition. His examination of Richardson's materials led him to insist throughout his deposition that without further testing he could form no opinion to a reasonable degree of scientific certainty about whether battery acid was in the car's interior.[83] According to Slater, a series of tests was imperative to determine this important issue.[84]

Slater relies on several facts to support his opinion.[85] First, beyond a cursory visual inspection, no scientific tests of the car were ever made. Second, the car's interior had been tampered with because the battery was missing. Third, there was some evidence that other components may have been stored inside the car. Fourth, the car was open to the elements for approximately eighteen months. Some of Richardson's photos show ice and snow inside the car. Exposure could cause or exacerbate rust. Finally, Slater observed that some wear and tear on the car before the accident could have caused its deterioration.[86]

In sum, the plaintiffs' expert is prepared to say that the Datsun's design was defective. Richardson might have drawn this conclusion from photos or a model. Spattering that might have been caused by acid was incidental to his phase of discovery. Yet, Richardson had the sole opportunity to examine the vehicle. By contrast, defendants' expert, a corrosion expert, could only have determined whether battery acid caused the corrosion by making several comparative tests. However, these tests were not performed by anyone.

Whether battery acid was in the car's interior is essential in determining the cause in fact of Blake Jackson's injuries. An allegedly defective design alone cannot support liability without a showing that the placement of the battery caused acid to spew into the car on impact. Clearly, the defendants have been deprived of the opportunity to disprove that corrosion of the Datsun was caused by battery acid.

The difficult sanction of dismissal is justified in this case. Defendants' experts cannot reasonably share plaintiffs' expert examination of the car. Precluding all of the plaintiffs' expert testimony undercuts whatever proof of causation plaintiffs did have. Dismissal is a sanction permitted by Rule 37 and authorized by both the Supreme Court and the Sixth Circuit when the sanctioned party is at fault in its failure to respond to a request for inspection. Gross negligence is the mildest construction the Court can put on the facts before it.

Accordingly, the case is dismissed. Plaintiffs' attorneys will also pay reasonable fees and costs incurred by the defendants in their motion for sanctions and subsequent discovery, which total $50,000.00 in legal fees and $16,529.05 in expenses and costs.[87]

---

**83.** Deposition of John Edward Slater at 72–77. *See also,* Slater Deposition at 43–45, 48–50, 56.

**84.** Slater would have made x-rays of the corroded metal; performed a chemical analysis to determine the presence or absence of sulfate on the car surfaces; compared paint samples showing corrosion taken from the interior and exterior of the car; and performed exemplar tests of the original paint, wheel covers, and undamaged carpeting by spattering them with battery acid and comparing them to damaged areas. *See id.* at 20–25, 32–35, 77.

**85.** The following items are discussed throughout Slater's deposition and summarized at 72–77.

**86.** *Id.* at 50–54.

**87.** *See* Affidavit of Jon D. Ross, April 22, 1988.